Filed 10/24/14  In re D.C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.C., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D066079 |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1163) |
| v. | |
| CIERRA C., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J.

Birkmeyer, Judge.  Affirmed.


Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and

Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Cierra C. appeals from a judgment declaring her son D.C. a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivision (b)[1] and removing D.C. from her custody.[2] Cierra contends there was insufficient evidence to support the juvenile court's findings that there was a risk of harm to D.C. if he were returned to her custody and that there was no reasonable alternative to removal. Cierra also contends there was insufficient evidence to support the court's order requiring that her visitation with D.C. be monitored. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On April 4, 2014, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of three-week-old D.C. under section 300, subdivision (b) alleging that on the day he was born, D.C. tested positive for amphetamine and/or methamphetamine and marijuana, and Cierra tested positive for the same substances. The petition further alleged that Cierra denied using drugs after she discovered she was pregnant, but admitted to a history of use. On four occasions she failed to submit to drug testing requested by Agency. The alleged father admitted to drug use and tested positive for the same substances on March 17, 2014. Both parents admitted to having two incidents of domestic violence with each other—Cierra was arrested for inflicting corporal injury in October 2013 and the father was arrested for battery on the mother in

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] In a dependency case, the disposition order is the first appealable order and constitutes the judgment in the case. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.)

February 2014. The petition alleged that "the parents remain in contact with each other while the child is present and are untreated for substance abuse and domestic violence[,] and there is a substantial risk that the child will suffer serious physical harm or illness."

In the Agency's detention report, social worker Hongsing Phou stated when he interviewed Cierra in the hospital the day D.C. was born, Cierra denied drug use and did not have a plausible explanation for her and D.C.'s testing positive for drugs. Cierra admitted she had smoked cigarettes and marijuana, but said she stopped smoking when she was told she was pregnant at the sixth month of her pregnancy. Phou told Cierra she would not have tested positive for marijuana if she had stopped smoking it then, but Cierra was adamant that she had stopped smoking marijuana when she learned she was pregnant three months before D.C. was born.

Regarding the positive tests for amphetamine, Cierra told Phou that approximately six days before D.C.'s birth, she had an ear ache and asked the alleged father to get her some Tylenol. The father brought her some pills that he claimed were a generic Tylenol he had received from the paternal grandfather's friend. Cierra did not believe the father would give her drugs knowing she was pregnant, but after she took the pills she felt sick and fell asleep. She said she had used methamphetamine in the past but not since May 2013. A doctor at the hospital where D.C. was born reported that Cierra had tested positive for amphetamine and THC (tetrahydrocannabinol) in August 2013. Phou reported that Cierra's "claims that [D.C.'s positive drug test] was a result of the Tylenol are unfounded. Tylenol or Tylenol with codeine does not contain amphetamine/methamphetamine or marijuana."

3

Phou interviewed the alleged father in the home on March 17. The father said that Cierra was not currently abusing any drugs and that he did not allow her to use drugs once they learned she was pregnant. When Phou asked the father about his own drug abuse, he admitted he had used "speed" before Phou came to the home. The father tested positive that day for marijuana, amphetamine, and methamphetamine.

The Agency allowed Cierra to take D.C. home and created a safety plan to allow him to remain in the home pending completion of an investigation by the Agency. The safety plan included Cierra's agreement to submit to drug testing on demand. The Agency asked Cierra to drug test on March 27, March 28, April 1 and April 2, but she failed to test on each of those dates. The excuses Cierra gave Phou for failing to test were that (1) the stitches from her cesarean section came out and she was in a lot of pain and could not walk; (2) D.C. had an appointment with a pediatrician; (3) the weather was too cold for D.C. to be out; and (4) she could not find a ride. Phou offered to take Cierra to the drug test location and gave her two bus passes. On April 4, 2014, the Agency obtained a protective custody warrant and detained D.C. at Polinsky Children's Center. The next day he was placed in a licensed foster home.

At the detention hearing on April 7, 2014, Cierra's counsel told the court that Cierra was planning to begin a substance abuse program the next day and was committed to doing whatever it took to get her son back. On behalf of Cierra, counsel requested "any and all voluntary referrals from the social worker above and beyond substance abuse" and suggested "a domestic violence or healthy relationship referral . . . ." The court found a prima facie showing had been made that D.C. was a person described by

4

section 300, subdivision (b), and ordered him detained in licensed foster care or the home of an approved relative or nonrelative extended family member. The court granted Cierra liberal supervised visitation and ordered her not to be under the influence of alcohol or drugs while visiting D.C. The court also ordered that the alleged father not be present during Cierra's visitation. Cierra visited D.C. the day after the detention hearing, but failed to show for three additional scheduled visits later in April.

Social worker Jose Padilla prepared the Agency's jurisdiction/disposition report. Padilla reported that Cierra failed to show up for two scheduled jurisdiction/disposition interviews with him. When Padilla called Cierra to ask why she missed the second interview appointment, Cierra told him she would not be meeting with him and did not understand why D.C. had been removed from her. Cierra continued to deny using marijuana and methamphetamine during the last three months of her pregnancy and did not know why D.C. tested positive for those drugs. She thought marijuana might still be in her system from several months ago and because she was around a lot of people who smoked it. She denied any current drug use. Padilla asked if she was willing to drug test that day and she said she needed to consult her attorney before drug testing. Padilla asked to reschedule the jurisdiction/disposition interview but Cierra refused. She told him she just wanted her baby back and would see him in court.

Cierra failed to show up for drug test appointments on April 11 and April 15, 2014, even though Padilla had informed her that her failure to test on April 15 would be considered a positive test. Cierra again refused to drug test for the Agency on April 17. Padilla concluded that Cierra and the alleged father both had a substance abuse problem

5

that they needed to address through treatment. Their drug use impaired their ability to adequately and safely parent D.C., and it appeared they were "not supporting each other in efforts of sobriety." Padilla also reported the Agency's concern that the parents would continue to engage in domestic violence in D.C.'s presence, which would put D.C. in "physical and emotional harm's way."

Padilla filed an addendum report in which he discussed a meeting he had with Cierra at court on May 12, 2014. Padilla asked Cierra if she had changed her mind about visiting D.C.[3] Cierra said she did not want to visit D.C. until she got him back. Padilla explained that visitation was part of the reunification process. Cierra said she understood that but was hoping the Agency would just return D.C. to her or she would "win" the trial (i.e., the contested jurisdiction/disposition hearing) and get him back. She said it was too hard for her to see him and not be able to take him home, and that it would be hard on D.C. to see her and not be able to go home with her. Padilla asked Cierra what she was doing with her time. She said all she did was cry and miss her baby.

Padilla asked Cierra why she had failed to appear for a drug test on April 29. Cierra said she did not trust the Agency or the staff at the drug testing site and felt they would "lie" on her drug test. She denied using drugs. Padilla noticed Cierra's eyes were red and glossy and her jaw was moving slightly, and he could hear suction noises coming from her mouth. He asked her if she was under the influence of drugs and she said, "No." Padilla asked her to drug test that day and told her that a "no show" to the test would be

---

[3]     Cierra apparently had told Padilla that she was not going to visit D.C.

considered a positive test. He also asked her to talk to the drug abuse specialist at the court. Cierra responded, "No, I won't go talk to her. I don't have a drug problem. I just want my baby back." Cierra said she did not trust Padilla or her attorney, and felt that her attorney was "working for you guys."

Padilla reported that Cierra continued to contact the alleged father. D.C.'s foster mother shared with Padilla an exchange of hostile text messages between Cierra and the father that Cierra initiated and accidentally sent to both the foster mother and the father.

At the contested jurisdiction/disposition hearing on May 22, 2014, the court admitted in evidence the curricula vitae of Phou and Padilla and the Agency's detention report, jurisdiction/disposition report, and addendum report. The court also heard testimony from Phou and Cierra. The court found by clear and convincing evidence that the allegations in the petition were true and declared D.C. a dependent of the court. The court ordered D.C. removed from Cierra's custody and directed the Agency to provide Cierra reunification services. The court further ordered drug testing for Cierra and ordered her to participate in substance abuse treatment and undergo a psychological evaluation.

## DISCUSSION

### I. *Dispositional Findings*

Cierra contends there was insufficient evidence to support the juvenile court's findings that there was a risk of harm to D.C. if he were returned to her custody and that there was no reasonable alternative to removal.

7

To remove D.C. from Cierra's parental custody, the court was required to find by clear and convincing evidence that "[t]here is or would be a substantial danger to [his] physical health, safety, protection, or physical or emotional well-being . . . if [he] were returned home" and that removal was the only reasonable means of protecting his physical health (§ 361, subd. (c)(1)). "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136.) The court is entitled to consider the parents' past conduct and current situation and gauge whether they have progressed sufficiently to eliminate any risk. (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; cf. *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1221.)

On appeal, Cierra has the burden of showing that there is no substantial evidence justifying removal. (*In re Diamond H., supra* 82 Cal.App.4th at p. 1135; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.) Evidence is substantial if it is " ' "reasonable, credible, and of solid value." ' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) It is the trial court's role to assess the credibility of witnesses and resolve the conflicts in the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

We conclude substantial evidence supports the court's removal order. Cierra and D.C. tested positive for illegal drugs at D.C.'s birth and Cierra admitted she used drugs during the first six months of her pregnancy. The Agency allowed Cierra to take D.C. home from the hospital after his birth, despite his and Cierra's positive drug tests, and created a safety plan that included Cierra's agreement to submit to on-demand drug testing. However, Cierra repeatedly failed to drug test after D.C.'s birth and appeared to be under the influence of drugs when she met with Padilla at court 10 days before the jurisdiction/disposition hearing. Her explanation for testing positive for amphetamine (taking two unlabeled pills that were supposed to be generic Tylenol six days before D.C.'s birth) was implausible and did not account for her testing positive for marijuana. Her explanation for her reluctance to test in the future was her unfounded fear that the Agency and drug testers would "lie" on her drug test—i.e., report a positive test if she actually tested negative. Although Cierra consistently denied having a drug problem, when she was asked on cross-examination at the jurisdiction/disposition hearing why she had not drug tested, she responded, " . . . I figured if I started [testing], that testing would be kind of like incriminating myself . . . ." Despite her counsel's representation to the court at the detention hearing that she was planning to begin a substance abuse program the next day, as of the time of the jurisdiction/disposition hearing, Cierra had not participated in any substance abuse treatment services. Based on the evidence regarding Cierra's substance abuse, denial of drug use, and refusal to drug test, the court could reasonably find that Cierra wanted D.C. returned to her custody and wanted to continue to use drugs after his return.

9

The evidence of Cierra's denial of a drug problem after testing positive for substance abuse and her refusal to undergo further drug testing is itself sufficient to support the court's findings that there was a risk of harm to D.C. if he were returned to her custody, and there was no reasonable alternative to removal. The removal order is further supported by evidence that Cierra remained in contact with the alleged father, who was a drug abuser, and that both she and the father had engaged in domestic violence. In the jurisdiction/disposition report, Padilla expressed the Agency's concern that Cierra and the father would continue to use methamphetamine and other illegal substances and neglect D.C.'s needs, and that "the parents will continue to engage in domestic violence in [D.C.]'s presence[,] which will place [D.C. in] physical and emotional harm's way." The court was entitled to find Padilla's opinion credible, and to give great weight to his assessment. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

The court's finding that there was a sufficient risk of harm to D.C. to justify his continued removal from Cierra's custody was further supported by evidence that Cierra was suffering from untreated depression. Cierra was diagnosed with postpartum depression when she was discharged from the hospital after giving birth to D.C. Padilla reported that 10 days before the jurisdiction/disposition hearing, Cierra told him that that she had not returned to work "and that all she does is cry and [miss] her baby." At the jurisdiction/disposition hearing, the court noted Cierra's display of "extreme emotions in the courtroom and . . . some behavior that would appear to necessitate a psychiatric

10

evaluation of mother."[4]  The court stated, "I have some real concerns as to whether there may be some postpartum depression in mother's statements about how she has been crying constantly . . . .  And I want to make sure that she is able to fully engage in her services."  The court ordered a psychological evaluation over Cierra's objection, and reiterated that it had "been very concerned about [Cierra] and her behavior in the courtroom and her affect.  I note that she has seemed at times almost despondent.  There is quite a bit of crying.  There are references in the [Agency's] report to her having long periods of crying, and the court has significant concerns and would like to get her help and be properly directed."

The court's removal order was also supported by evidence that although the court granted Cierra liberal supervised visitation with D.C. and Padilla informed her that visitation was part of the reunification process, she rarely visited him, failed to show up for scheduled visits, and ultimately told Padilla that she did not want to visit D.C. until he was returned to her.

Finally, the removal order was supported by evidence of Cierra's general refusal to cooperate with the Agency after D.C.'s detention.  She refused to meet with Padilla for a jurisdiction/disposition interview and when she was asked at the jurisdiction/disposition hearing why she had refused to meet with him since he was assigned to the case, she testified, "Because . . . I haven't wanted him to twist anymore of my words than he already has."  When she was asked if she would be willing to participate in services that

---

4      The court orally ordered a "psychiatric" evaluation, but its written order stated that Cierra "shall undergo a psychological evaluation."

the Agency would request if D.C. were returned to her, she equivocally responded, "I don't know about any services by the Agency. It depends on what you mean by that. Because . . . I'm really disappointed in the Agency the way that they have handled things with me, and the things they suggested for me. I don't know. I mean, if it's in my baby's best interest, of course."

In its oral ruling removing D.C. from Cierra's custody, the court noted, "Even today, as the court sits here and watched her as to whether she would engage in appropriate services if the baby were returned to her, I watched the change in mother's demeanor. She smiled and cocked her head and said[] there were some things that [she] wouldn't do. She would have to see. [¶] . . . [¶] But I have great concerns, even today as she sits before the court, whether there would be any services that she would willingly engage in light of the numerous efforts that the Agency made to engage with her while the baby was in her care. [¶] And also of concern to the court, and another basis for the show of reasonable efforts [to prevent or eliminate the need for D.C. removal], is that mother has been offered, as requested by her counsel, . . . voluntary services. In her view she doesn't want to engage in that. [¶] . . . Reasonable efforts have been made to prevent or eliminate the need for removal of her child or the attempt to reunify her prior to this hearing, and, sadly, mother did not engage." It is well settled that we must defer to the trial court's factual findings that are based on its assessment of live testimony because " '[w]e review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses.' " (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427.)

The court's findings that there was a risk of harm to D.C. if he were returned to Cierra's custody and there was no reasonable alternative to removal are amply supported by the evidence of Cierra's substance abuse, her denial that she had a drug problem, her refusal to drug test, her continued contact with the alleged father, her refusal to meet with the Agency social worker assigned to her case or otherwise cooperate with the Agency, her untreated depression, and her failure to avail herself of the liberal visitation she was granted with D.C. Cierra has not met her burden on appeal of showing there is no substantial evidence justifying removal.

## II. *Requirement of Monitored Visitation*

Cierra contends there was insufficient evidence to support the court's order requiring that her visitation with D.C. be monitored.[5]

The appropriate standard of review for custody and visitation orders is abuse of discretion. (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557-1558; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) " 'The reviewing court must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child. [Citation.] We are required to uphold the ruling if it is correct on any basis, regardless of whether it is the ground relied upon by the trial judge. [Citation.]' [Citation.] The trial

---

5       The court did not expressly address visitation in its jurisdiction/disposition order. The court granted Cierra liberal supervised visitation in its detention order and stated in its jurisdiction/disposition order that "[a]ll prior orders not in conflict remain in full force and effect." (Capitalization omitted.)

13

court is accorded wide discretion and its determination will not be disturbed on appeal absent 'a manifest showing of abuse.' " (*In re Robert L.,* at p. 1067.)

The evidence that Cierra abused drugs and denied having a drug problem supports the court's exercise of discretion to require that Cierra's visitation with D.C. be monitored. Section 300.2 provides that "[t]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." In its detention order, the court specifically ordered Cierra not to be under the influence of alcohol or drugs while visiting D.C. Cierra repeatedly denied using drugs despite testing positive for them when she gave birth to D.C.; she refused to undergo drug testing after D.C. was born; and she appeared to be under the influence of drugs when she met with Padilla at court 10 days before the jurisdiction/disposition hearing. Considering these circumstances, the court could reasonably be concerned that if Cierra were granted unsupervised visitation with D.C., she would be under the influence of drugs during the visitation, which would create a risk of harm to D.C.'s physical and emotional well-being because there would be no one to intervene if her substance abuse caused her to neglect or act inappropriately toward D.C. On this record, Cierra cannot meet her burden of showing that the requirement of monitored visitation was a manifest abuse of discretion.

14

DISPOSITION

The judgment is affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.